# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

WILLIAM and ALDINE GASPERS,

        Plaintiffs,

      v.                                      Case No. C-1-06-832

OHIO DEPT. OF YOUTH SERVICES,
et al.,

        Defendants.

## ORDER

This matter is before the Court upon defendants' motion for summary judgment and/or for qualified immunity (doc. 47), plaintiffs' opposing memorandum (doc. 55) and defendants' reply memorandum (doc. 59). The parties have filed proposed findings of fact and conclusions of law, which the opposing side has highlighted as true, false, or irrelevant (docs. 57, 62). The Court heard oral argument on the motion on June 2, 2009.

### I. Introduction

Plaintiffs bring this action pursuant to 42 U.S.C. § 1983 seeking redress for alleged violations of their rights under the First Amendment to the United States Constitution. Plaintiffs name as defendants the Ohio Department of Youth Services (DYS) and the Ohio River Valley Juvenile Correction Facility (ORVJCF). Plaintiffs also name as defendants the following individuals, all of whom they sue in their personal and official capacities: George Oliver, the former Bureau Chief of Labor Relations for DYS; Kevin Miller, the former Chief of Staff for

DYS; Geno Natalucci-Persichetti, the former Director of DYS; Thomas Stickrath, the current Director of DYS; Tina Krueger, the Deputy Director of Human Resources for DYS; Barry Braverman, the former Labor Relations Officer for DYS; James Heineman, the former Deputy Director of Institutions for DYS; and Andrea Morbitzer, the Deputy Director of DYS.

Plaintiffs make the following allegations in the amended complaint: Plaintiffs William and Aldine Gaspers have been married since December of 1996. William Gaspers is a current employee of the DYS and has served as a Training Officer at the ORVJCF since April of 1996. Aldine Gaspers has been employed by DYS since October of 1996. In February of 2004, Aldine Gaspers was named Superintendent of ORVJCF. At that time she was instructed by the then Deputy Director of DYS Heineman to prepare a new table of organization so as to avoid any reporting relationship with her husband. She did so, and the revised table was approved, so that William Gaspers reported directly to individuals other than his wife.

In late July of 2004, an article appeared in the *Columbus Dispatch* which included allegations of nepotism regarding the Gaspers. Although the allegations were without merit, the article reflected poorly upon DYS. Following publication of the article, there were changes in top management at DYS.

In late November of 2004, DYS investigated William Gaspers after he traveled in a state vehicle in which he inadvertently carried a small weapon in a shaving kit. The investigation led to a pre-disciplinary hearing which occurred on or about December 1, 2004. After the hearing, defendant Oliver told William Gaspers that he should accept a transfer to a different facility and that if he did not, he would be fired. He refused to accept the transfer.

Effective December 14, 2004, Williams Gaspers, who had no prior disciplinary record,

was fired for the alleged unauthorized possession of a weapon on state property. Defendant Miller signed the removal notice for Natalucci-Perichetti, the Director of DYS. Upon information and belief, defendants Oliver, Krueger, Braverman, Miller, Heineman and Natalucci-Perichetti participated in the decision to terminate William Gaspers.

William Gaspers filed a grievance regarding his termination pursuant to the collective bargaining agreement between DYS and his union. On or about October 11, 2005, arbitrator James Brookens determined that he had been terminated without just cause and he was reinstated to his position without backpay. As a result, the Gaspers were again working together at the ORVJCF.

In December of 2005, DYS Deputy Director Morbitzer gave Aldine Gaspers the first "below standards" review of her career. Aldine Gaspers appealed the rating and succeeded in having it raised to "on target." In February of 2006, DYS Director Stickrath notified her that she would be transferred from the ORVJCF and moved to another location and that she would remain at ORVJCF until a suitable replacement could be found. There was no legitimate reason for the transfer.

In June of 2006, Aldine Gaspers was transferred to the Division of Parole Services in Columbus, Ohio, which is approximately 125 miles from her residence, whereas her previous commute to ORVJCF had been approximately six miles. The stated reason for the decision was to "change the culture" at ORVJCF, which is pretextual.

By taking these actions, defendants have infringed upon plaintiffs' clearly-established right to freedom of association and have retaliated against William Gaspers for the exercise of his right to file a grievance and seek redress for the wrongful termination of his employment. As

a result of defendants' conduct, Williams Gaspers has suffered loss of income and fringe benefits, damage to his reputation, and emotional distress, and Aldine Gaspers has incurred living and travel expenses and has suffered the aggravation of an existing medical condition and emotional distress. They seek damages and equitable relief.

## II. Findings of Fact

The following facts are undisputed:

1. Plaintiffs Aldine and William Gaspers are employees of DYS at ORVJCF who married on December 28, 1996.

2. DYS is a agency of the State of Ohio created pursuant to Ohio Rev. Code Ch. 5139.

3. Among its other duties, DYS takes custody of juveniles committed to it by the Ohio courts, operates institutions such as the ORVJCF throughout the State for the confinement and rehabilitation of youth, and makes certain decisions regarding the post-confinement release of youth in its custody through its Release Authority.

4. The Director of DYS is the appointing authority empowered to hire, discharge, or transfer all of the agency's employees pursuant to Ohio Rev. Code § 5139.01(B). Natalucci-Persichetti served as Director from February 1987 until December 31, 2004, when he was replaced by Stickrath. Stickrath became Director on January 1, 2005, after William Gaspers had been terminated.

5. Miller served as Chief of Staff reporting to Natalucci-Persichetti. Miller left shortly after Stickrath replaced Natalucci-Persichetti, and he was not replaced.

6. Reporting to Miller were several Deputy Directors, including Heineman, who served as Deputy Director of Institutions from 1999 until he retired in January 2005; Mohr, who

4

replaced Heineman; and Morbitzer, who replaced Mohr in 2005.

7.     As Superintendent of ORVJCF, Aldine Gaspers reported to the Deputy Director.

8.     Krueger served as Deputy Director for Human Resources from 2003-07.  Oliver, the
       Bureau Chief for Labor Relations, reported to Krueger until he retired in August 2006.

9.     Braverman was a Labor Relations Officer who reporter to Oliver.  He is now retired.
       Except for having sat in on a pre-disciplinary conference and conveying settlement offers
       to others, he appears to have played no role in any of the events underlying this case.

10.    Aldine Gaspers has been employed by DYS since 1996.  She began her employment as a
       Youth Services Administrator at ORVJCF.  Effective February 19, 2004, Natalucci-
       Persichetti promoted her to Superintendent.

11.    William Gaspers also began his employment at DYS and ORVJCF in 1996.  During his
       employment, he has served as the Training Officer for the facility.  His duties generally
       were to track attendance and training records and conduct training.

12.    DYS management expressed no particular concern about the Gaspers working together
       when Aldine Gaspers was considered for the Superintendent position other than a
       concern as to the need to devise a new chain of command for her husband, who was one
       of her employees at ORVJCF.

13.    DYS did modify the chain of command so that Williams Gaspers' direct supervisor could
       bypass Aldine Gaspers concerning her husband, and if his supervisor was unavailable,
       then DYS provided four different individuals to whom William Gaspers could report,
       including individuals at the DYS Central Office.  William Gaspers did not report to his
       wife.  His supervisor was Tami Collingsworth.  In Collingsworth's absence, William

Gaspers was directed to report to other managers.

14. Once Aldine Gaspers became Superintendent, her husband voluntarily stepped down as chair of the committee that oversaw youth discipline so as to avoid a situation where he was "judge and jury and [Aldine Gaspers] the executioner."

15. William Gaspers voluntarily stepped down from the hostage negotiation team. In his words, he did not "want to open up a can of worms" by staying in such positions within the institution.

16. Some employees resented Aldine Gaspers' promotion. An anonymous act of vandalism occurred. She received a negative letter. One employee told William Gaspers that he would file a grievance because he was tired of the "situation."

17. A rumor reached Aldine Gaspers that unless issues involving "pick-a-post" and the Liberation Complex were resolved and "if things didn't change between [her and] the union," the Ohio Civil Service Employees Association, Local 11 (OCSEA), would file a grievance alleging "nepotism." The union also complained to Oliver about the Gaspers working together.

18. The union wanted the "rules of nepotism to apply and for the direct line of supervisor to be broken." The rules regarding nepotism were, however, being followed. William Gaspers was not reporting to Aldine Gaspers.

19. On April 2, 2004, OCSEA filed the threatened grievance. The union informed Oliver that the impetus for the grievance was that William Gaspers "was throwing his weight around and was somewhat . . . intimidating [to] some of the staff and the kids." Oliver depo., pp. 37-38. Without anything concrete, however, and as this was an internal matter

of the union effectively filing a grievance against one of its own members, Oliver and Krueger determined that there was no reason to disturb the Gaspers' working situation. Labor and management reached a "perfunctory" settlement of the grievance in September.

20. Privately, Oliver felt the situation was awkward because it was allegedly creating an issue for the union that he had to deal with.

21. In July 2004, an article appeared in the *Columbus Dispatch* which mentioned that some DYS staff were annoyed at the influx of former Ohio Department of Rehabilitation and Correction (ODRC) staff into DYS and the fact that relatives such as the Gaspers were employed at ORVJCF. DYS defended plaintiffs, and plaintiffs believed that management was supportive throughout this incident.

22. In early October 2004, William Gaspers brought up the proposition of transferring to the training facility in Delaware, Ohio. He had been interested in a training position at the academy. In light of the "nepotism" grievance and newspaper article, William Gaspers thought that "if it would help to alleviate those problems for [his] wife, [himself], and the agency, that perhaps this would be in [his] best interest and [in that of] everyone concerned."

23. Krueger, who supervised the Training Academy at the time, would have welcomed the help there. The Superintendent of the Training Academy at the time, however, non-defendant Thomas Teague, responded that William Gaspers' services were not required.

24. The facts leading to William Gaspers' removal are that without any authorization, he possessed a .25 caliber pistol, as well as ammunition, on state grounds, in a state vehicle,

while conducting state business.

25.    Following the investigation, he was served with a notice of pre-disciplinary hearing.  He was charged with a violation of Rule 4.17 for the unauthorized possession of a weapon on state property.

26.    DYS Policy 103.17 organizes offenses into four "levels."  The most serious, Level Four, included Rule 4.17, which prohibited "[p]ossessing an unauthorized weapon or facsimile thereof while on state property, in a state vehicle, or [while] conducting state business."  The disciplinary grid provided for discipline ranging from a 6-day suspension to termination.

27.    On December 1, 2004, a pre-disciplinary hearing was conducted in Columbus, Ohio.  Joan Oliveri was the hearing officer.  William Gaspers and Mike Price, his union representative, attended.  William Gaspers fully acknowledged possession of the weapon but claimed that he did not knowingly or intentionally carry the weapon in a state car or possess it on state property. The hearing officer found just cause for some discipline but made no recommendation as to the level of punishment.

28.    Generally, Natalucci-Persichetti held the view that automatic termination was warranted for egregious violations like abuse of a juvenile or possession of drugs or firearms.  He had a "zero tolerance" view of these offenses.  Miller pushed for termination.  Moreover, Miller was concerned that William Gaspers, as a Training Officer, was supposed to serve as a role model for other staff.

29.    According to Miller, Natalucci-Persichetti said  ". . . let's see if we can't - -  in deference to Aldine and his tenure . . . find something else for him."  Miller depo., pp. 41-42.

Natalucci-Persichetti did agree with Miller, though, that he could not "have a training officer who goes to trainings and does something like this." The demotion would be to Juvenile Correction Officer (JCO), which would place William Gaspers directly in the chain of command through Aldine Gaspers, which could not be dealt with so easily as a Training Coordinator position or allow for creation of a chain of command for William Gaspers that was different from that of all the other JCO's.

30. According to Krueger, once the Hearing Officer's report regarding William Gaspers was received, she met with Natalucci-Persichetti and told him that she did not think termination was called for but that a demotion or strong suspension was in order; however, Natalucci-Persichetti would not consider any option other than termination.

31. Oliver intercepted William Gaspers and his union steward on the street and invited them to his office. Oliver proposed that William Gaspers accept a demotion to JCO and a transfer to the Circleville Juvenile Correctional Facility in lieu of termination (Circleville). Circleville is the closest DYS facility to ORVJCF.

32. While William Gaspers and Oliver differ in their recollections of some of the details of their meeting, the thrust is the same. Williams Gaspers recalls that Oliver told him that their discussion was "off the record" and that up until the day before - when Oliver learned that Natalucci-Persichetti would be resigning - Oliver would have been more confident in what he was about to propose. He also recalls that Oliver said that if he did not take the demotion, DYS would "fire [his] ass," that the nepotism issue had been a problem since his wife has taken the Superintendent's role, and that had it been left up to Oliver, the Gaspers would not have been allowed to work in that facility from the very

beginning.  At the same time, Oliver said the conversation with William Gaspers had nothing to do with the nepotism grievance.

33. Oliver acknowledged that the situation created by the Gaspers working together at ORVJCF was awkward and that he was looking for a way to placate the union and salvage William Gaspers' job.  Oliver saw the transfer as a way to make his own job easier because it would fix the alleged perception of nepotism the union had raised.

34. Regarding the suggestion of a demotion to another facility, William Gaspers said that he would not be interested in a JCO position.  Oliver suggested that he at least consider a demotion for his wife's sake and that he discuss the offer with her.  At one point, William Gaspers brought up the possibility of transferring to a Training Officer position in Delaware.

35. Oliver reported to Natalucci-Persichetti and Miller that William Gaspers claimed that his mother was sick and Circleville was too far to drive, so he rejected the proposal to work there.  DYS then contacted Stickrath, who was still at ODRC, about a Corrections Officer position at the Southern Ohio Correctional Facility (SOCF) for adults in Scioto County, a few miles from ORV.  Stickrath agreed to make a position available at SOCF.

36. Natalucci-Persichetti's position now was that if William Gaspers was not interested in a demotion to Circleville or in the SOCF position, then the remaining alternative was termination.

37. DYS had removed employees in the past for possessing a weapon on DYS grounds.  One such employee, who had an 18-year unblemished record, had brought a firearm onto DYS grounds in the trunk of his car.  Another had forgotten he had a rifle in a pick-up

truck that he drove onto DYS grounds but then showed the weapon to another JCO.

38. Effective December 14, 2004, DYS terminated William Gaspers' employment.

39. He filed a grievance to contest his removal, claiming that he was removed without just cause, he had been subjected to intimidation and harassment by individuals responsible for the decision, and the discipline was excessive rather than progressive.

40. As the grievance progressed, several discussions took place about a resolution. There was no proposal from defendants that allowed William Gaspers to return to ORVJCF where his wife was the Superintendent.

41. Between mid-December 2004 and January 1, 2005, Stickrath replaced Natalucci-Persichetti as Director of DYS. Stickrath was briefed on the settlement discussions of William Gaspers' grievance. It was suggested that a desirable settlement may be that William Gaspers be placed somewhere other than ORVJCF because of "concerns, in a general sense, about . . . his relationship with the superintendent and general issues of nepotism." Stickrath felt that if "we were going to take what appeared to be a very solid case for removal and talk settlement, that it might be a healthy decision for the institution or the agency" to take a look at William Gaspers' assignment as part of any resolution. Stickrath had a "discomfort in general with having a spouse and superintendent work at the same facility. It's a concern about nepotism and the impact on operations and decision making."

42. Braverman attempted to resolve William Gaspers' union grievance challenging his termination, reiterating the Oliver offer. Krueger offered William Gaspers the opportunity to take a position at the Training Academy as he had previously expressed

interest in doing, in which case his removal would be converted to a 6-day suspension and he would receive back-pay.

43. The arbitration of the grievance took place on August 8, 2005.

44. The preceding month, Morbitzer had become the Assistant Deputy Director of Institutions at DYS. In 2005, when her supervisor retired, Morbitzer transitioned into the position of Deputy Director of Institutions.

45. By that time, Morbitzer had already formed concerns over issues of institutional culture and issues surrounding conditions of juvenile confinement at ORVJCF.

46. On September 6, 2005, shortly after becoming Deputy Director, Morbitzer walked through ORVJCF with Aldine Gaspers. She wanted to see improvement in conditions generally and in the Intensive Programming Unit (IPU), also known as "Grant," in particular.

47. Morbitzer later sent Aldine Gaspers a list of questions about the unit, and she responded. Aldine Gaspers had prepared a binder full of information about Grant.

48. Morbitzer visited ORVJCF several times. Although Morbitzer did not mention "culture," Aldine Gaspers "got the sense that [Morbitzer] was not sure of the institution." This sense may have been fueled by Morbitzer's desire to investigate an incident involving Aldine Gaspers that had occurred under Morbitzer's predecesssor, Gary Mohr, involving a youth who had marked himself with a green magic marker one evening. While Aldine Gaspers had not been disciplined for the incident and Mohr never mentioned the incident to Stickrath, Morbitzer thought the situation could have been handled differently.

49. Morbitzer also testified at her deposition that she had a concern about a youth offender

with mental health issues with whom she had contact in May of 2005, prior to his entering ORVJCF. Morbitzer believed he had lost a significant amount of weight. Morbitzer did not follow up with any medical personnel regarding the youth.

50.    Both Stickrath and Morbitzer noted that ORVJCF management was not documenting superintendent and deputies' personal visits in unit logs, so there was no indication that higher management was visible on the units to deter malfeasance or to gather first-hand information about the treatment of youths. Such documentation is not only good management practice but also is required by American Correctional Association standards.

51.    On October 3, 2005, Arbitrator Thomas Brookens issued an award instructing DYS to reinstate William Gaspers but without backpay. The arbitrator found that William Gaspers' relationship to the ORVJCF superintendent had no adverse effect on the decision to remove him. The final decision amounted to a 10-month suspension (a reinstatement without back pay) subject to a "last chance agreement."

52.    On December 21, 2005, several juveniles in the ORVJCF IPU were loud and disrespectful of staff. Staff removed the youths to a "mini-gym" where the youths were allegedly handcuffed, stood in corners, pushed and twisted by the staff, marched about in circles, and made to sing "Jingle Bells." Plaintiff was not made aware of the incident until December 27, 2005. As soon as she learned what had happened, she requested an investigation.

53.    Stickrath felt that these allegations were shocking, particularly to the extent that the incident revealed that the staff apparently felt empowered to engage in such conduct.

13

Stickrath was disappointed in the incident, and he was also disappointed because Aldine Gaspers and others did not appear to share his reaction.

54. Because of this incident, Morbitzer visited ORVJCF on December 29, 2005, to discuss the mini-gym incident and how they could help change the "culture" at ORVJCF. Morbitzer was critical of Steve Cleckley, who supervised some of the staff at ORVJCF. Aldine Gaspers took exception to Morbitzer's implication that management at ORVJCF would condone improper treatment of youth at the facility.

55. That same day, Morbitzer gave Aldine Gaspers her annual performance review. Because of this incident, and because of Aldine Gaspers' response, Morbitzer rated her "below target" for poor "oversight" of a "program for a highly disruptive population." All other ratings were "on target."

56. Aldine Gaspers was very surprised at the rating and submitted an appeal. She did not believe that an entire year's performance should have been affected by one incident. Stickrath decided to raise the rating on Item 7 to "on target." At about the same time, he decided to remove her from ORVJCF, against Morbitzer's wishes.

57. On February 7, 2006, Stickrath and Morbitzer met with Aldine Gasperts to inform her that her days as ORVJCF Superintendent were numbered. Stickrath told her that she had done a very good job. He said that he was "looking to change the culture at ORVJCF and take it to the next level." Aldine Gaspers confirmed that the word "culture" was used increasingly in her conversations with Morbitzer and Stickrath after December 2005. Stickrath told her that he had decided to remove her from ORVJCF and that she would continue to serve in the Supervisor role until a replacement could be found. Stickrath

asked her if she had any recommendations for replacements and asked her to stay on at least through an audit scheduled for March of 2006.

58.    Stickrath inquired into Aldine Gaspers' career aspirations, and she confided that her long-term goal was to serve on ODRC's adult parole board. Stickrath had offered to connect her with helpful individuals at ODRC.

59.    Aldine Gaspers continued in the Superintendent role for several months. According to Morbitzer, a decision was made to quickly locate a replacement for Aldine Gaspers and she was told to contact Art Tate about the job after Stickrath was given information in May 2006 that Aldine Gaspers had allegedly assisted bargaining unit employees in appeals and arbitrations. Tate was subsequently named as Aldine Gaspers' replacement at ORVJCF.

60.    Effective May 22, 2006, Aldine Gaspers was offered an unclassified Policy Staff position at the DYS Release Authority in Columbus, Ohio. She was the liaison between the Release Authority and the DYS Reception Center, and her job was later expanded to include serving as the Administrative Assistant to the Release Authority Chair.

61.    Effective April 27, 2008, Aldine Gaspers took a voluntary demotion to an unclassified AA3 position at the DYS Office of Youth Records in Delaware, Ohio.

### III. Summary Judgment Standard

Fed. R. Civ. P. 56 allows summary judgment to secure a just and efficient determination of an action. This Court may only grant summary judgment as a matter of law when the moving party has identified, as its basis for the motion, an absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

The party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986) (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253 (1968)). The evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *Anderson*, 477 U.S. at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158 (1970)). However, a district court need not view the facts in the light most favorable to the nonmoving party if that party's version of events is "blatantly contradicted by the record, so that no reasonable jury could believe it." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

The court is not to weigh the evidence and determine the truth of the matter but is to decide whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. There is no genuine issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *Id*. at 249 (citing *Cities Serv.*, 391 U.S. at 288-289). If the evidence is merely colorable, *Dombrowski v. Eastland,* 387 U.S. 82, 84 (1967), or is not significantly probative, *Cities Serv.***,** 391 U.S. at 290, judgment may be granted. *Anderson*, 477 U.S. at 249.

### IV. Defendants' Motion for Summary Judgment

Defendants contend that they are entitled to summary judgment on the First Amendment claim and move for judgment as a matter of law. Defendants DYS and ORVJCF argue that they should be dismissed as defendants because the State is not subject to suit under § 1983, and the individual defendants claim that they must be dismissed when they did not personally participate in unconstitutional actions. In the alternative, the individual defendants claim that they are

entitled to qualified immunity on the ground that their actions did not violate clearly established law because plaintiffs can point to no binding decision of the Supreme Court, the Sixth Circuit, or this district court clearly establishing that adverse action based on concerns about the effects of nepotism is subject to anything more than rational basis review or that such actions have no rational basis, and Aldine Gaspers cannot identify a decision clearly establishing that any speech in which she engaged touched on a matter of public concern.

Defendants cite case law for the proposition that anti-nepotism policies which prohibit spouses or other closely-related persons from working together are usually subject to, and satisfy, rational basis review. This case law holds that if an anti-nepotism policy which does not place a direct and substantial burden on the right to marry satisfies a rational basis test, then it is not unconstitutional to terminate an employee pursuant to such a policy. *See Vaughn v. Lawrenceburg Power Sys*., 269 F.3d 703 (6th Cir. 2001). At the same time, defendants acknowledge that where an employment decision is taken solely to punish one spouse for the acts or status of the other, that decision violates the First Amendment right of intimate association. *See Adkins v. Bd. of Educ. of Magoffin Cty., Ky.,* 982 F.2d 952 (6th Cir. 1993). Defendants contend, however, that if the defendant is even partially motivated by legitimate concerns as to the effects of nepotism, then those concerns pass rational basis review (and presumably the termination passes First Amendment scrutiny).

Defendants argue that Williams Gaspers has no evidence that they acted for any reason other than his weapons violation; he was treated consistently with all similarly-situated employees, and his marriage to Aldine Gaspers motivated the Director to seek a way not to terminate him through settlement while maintaining consistency with past actions. Defendants

allege that to the extent nepotism concerns entered into these decisions, defendants' actions were still constitutional.

Defendants allege that Aldine Gaspers' claims fail because there is no evidence that defendants acted for any reason other than Stickrath's loss of confidence in her management of ORVJCF. Stickrath and Morbitzer claim that they had no particular stake in the outcome of William Gaspers' grievance and no motive to punish his wife for his arbitration victory; the four-month gap between William Gaspers' reinstatement and his wife's transfer gives no rise to an inference of retaliation; the fact that Morbitzer had been concerned about possibly abusive staff conduct on the Grant IPU before William Gaspers was reinstated undercuts any retaliatory inference; and Aldine Gaspers cannot show that she was treated differently than any similarly-situated employee whose failings were comparable in kind and severity. Defendants allege that Aldine Gaspers' First Amendment free speech retaliation claims fail because she did not engage in communication on a matter of public concern and her speech did not motivate her transfer.

In response, plaintiffs do not dispute that the Eleventh Amendment bars claims for damages against the state and its employees in their official capacities, but they claim that to the extent plaintiffs seek to recover prospective injunctive relief, the claims may proceed. Plaintiffs also claim that all of the individual defendants should remain in the lawsuit, with the possible exception of Braverman and Heineman, and they seek to place the burden on defendants to show who did not actively participate in the alleged unconstitutional activity. Plaintiffs further allege that none of the individual defendants is entitled to qualified immunity because the rights in issue, which are "the right of association to protect the marital relationship" and the right to be free from retaliation for assisting a party in a legal proceeding, were clearly established at the

time of the incidents in question.

Plaintiffs claim that defendants violated their First Amendment right of association by terminating William Gaspers because he was married to Aldine Gaspers and then after an arbitrator reinstated him, removing Aldine Gaspers from her job at ORVJCF in retaliation for being married to William Gaspers. Plaintiffs allege that the analysis set for forth in ***Adkins*** and ***Sowards v. Loudon Cty., Tenn.,*** 203 F.3d 426 (6th Cir. 2000) applies and that the elements of a retaliation claim under that analysis are satisfied because (1) plaintiffs engaged in the protected conduct of being married, (2) they suffered adverse actions in that William Gaspers was terminated and, after he was reinstated, Aldine Gaspers was subject to more scrutiny than in the past, she received a sub-par rating on her appraisal, and she was removed from her position as the Superintendent at ORVJCF and transferred to a position that required either a lengthy commute or relocation, additional travel or living expenses, and separation from her spouse; (3) there is a causal connection between the Gaspers' marriage and the adverse employment action against William Gaspers as evidenced by the fact that the union's concerns about the Gaspers' positions at the same facility had been brewing for months prior to William Gaspers' termination, a grievance alleging nepotism had been filed in April of 2004, an article discussing alleged nepotism had appeared in the Columbus newspaper in July of 2004, Oliver met with the union staff representative to hear concerns about perceived nepotism and the union's desire to have William Gaspers transferred (which Oliver admits was an awkward situation), Oliver felt that a transfer would placate the union's perceived concerns about the Gaspers working together, defendants treated William Gaspers in the harshest manner possible, defendants' assertion that the precedent had been to fire employees with weapons is questionable since although the

19

employees in the two prior such cases were fired, only one was able to grieve his termination and that employee was reinstated and his two-year last chance agreement was reduced to about 20 months, there is conflicting testimony about who made the decision to fire William Gaspers and why, and the focus seemed to be on transferring William Gaspers away from his wife rather than on terminating him.

As evidence of a causal connection between the protected activity of marriage and adverse actions against Aldine Gaspers, plaintiff points to her positive work record; the fact that after she testified at the arbitration hearing and William Gaspers was reinstated, defendants' view of her allegedly changed and Morbitzer decided to reexamine the circumstances surrounding the youth who colored himself with a marker; the fact that after William Gaspers was reinstated at ORVJCF, concerns about the Gaspers working together admittedly resurfaced; defendants' allegedly conflicting testimony about the rationale for removing Aldine Gaspers from ORVJCF, i.e., their citing the mini-gym incident and her failure to show enough concern for Stickrath's reaction as the key event, coupled with Stickrath's failure to mention the incident on December 21, 2005, his telling her when they met about the removal decision that her performance had been very good, and his improving her rating for Item 7 to "on target;" and the fact that defendants kept Aldine Gaspers on in her position for nearly five months after the mini-gym incident and then replaced her with someone who had been previously removed from a Superintendent position with abusive behavior. Plaintiffs also contend that the passage of time between William Gaspers' reinstatement in October of 2005 and Stickrath's decision in early February of 2006 to remove Aldine Gaspers from ORVJCF does not bar their claim, particularly since there is additional evidence of a causal connection in that Stickrath has acknowledged that

he had a concern about the Gaspers working together again at ORVJCF.  Plaintiffs also contend that there were intervening events from which a jury could find retaliation, specifically, after Aldine Gaspers testified at the arbitration hearing in August of 2005, Morbitzer reopened an issue and gave her a poor rating on her evaluation.

Plaintiffs contend that under *Sowards,* 203 F.3d 426, they do not have to show that the only reason for defendants' conduct was their protected activity; rather, they need show only that the adverse action was motivated at least in part by the protected conduct.  They claim it is an issue of fact to be decided by the jury as to whether defendants' desire to placate the "union's unfounded concerns" motivated the decisions at issue to any extent.

Plaintiffs allege that this case is not governed by cases cited by defendants in which employees either challenged a nepotism policy or the employer expressly defended the decision at issue based on concerns about nepotism.  *See Wright v. MetroHealth Med. Ctr*., 58 F.3d 1130 (6th Cir. 1995); *Montgomery v. Carr*, 101 F.3d 1117 (6th Cir. 1996); *Beecham v. Henderson Cty., Tenn.,* 422 F.3d 372 (6th Cir. 2005).  Plaintiffs cite *Vaughn*, 269 F.3d at 712, wherein the court explained the difference between the *Adkins* and *Montgomery* lines of cases, and they claim that the *Adkins* line of cases applies since defendant here have never expressly stated that they took action against plaintiffs to "advance legitimate governmental interests" associated with nepotism.

Aldine Gaspers also claims that she was retaliated against in violation of the First Amendment because she testified on her husband's behalf at the arbitration proceeding, which plaintiffs characterize as a legal proceeding.  Plaintiffs contend that the First Amendment protects a public employee from employer retaliation for participating in a legal proceeding as

either a party or a witness and that there is a causal connection between her testimony and the adverse actions taken against her for the reasons stated above. Plaintiff alleges that prior to August of 2005, she was highly thought-of and well-respected and after she testified, "Morbitzer seemed to question and scrutinized her work." Plaintiffs also claim that according to Morbitzer, Stickrath was angered to hear that Aldine Gaspers was assisting bargaining unit employees and William Gaspers was a bargaining unit employee on whose behalf his wife testified. Plaintiffs claim that jurors could find a causal connection from this.

In reply, defendants insist that it is not unconstitutional to fire or transfer someone because of their marriage if the action was motivated by concerns about "nepotism," i.e., workplace problems that may occur when closely associated people work together. Rather, defendants stress that constitutional violations occur only when the defendant is motivated by an "irrational desire" to punish one spouse for some conduct or status of the other beyond the simple fact of their marriage and the nepotism issues the relationship may present. Defendants maintain that so long as there is a plausible policy reason for the decision, then whether that reason in fact motivated the decision-maker is entirely irrelevant. Defendants argue that Stickrath did articulate plausible concerns about nepotism and plaintiffs cannot establish a First Amendment claim by proving that defendants separated the Gaspers based on these allegedly rational concerns.

Defendants argue that the evidence plaintiffs offer in support of their claim that William Gaspers was terminated for an unconstitutional reason actually demonstrates that defendants' motive was constitutional. First, defendants allege that the types of concerns OCSEA raised about nepotism are the kinds of reasons for preventing closely associated people from working

together found constitutional under Sixth Circuit case law. Second, defendants maintain that there is no conflict in the testimony as to why William Gaspers was terminated but that differences in the defendants' accounts are attributable to changes that occurred as the decision-making process proceeded. Third, defendants contend that William Gaspers was not treated less favorably than Richard Litten as they were both terminated for their offenses, although an arbitrator ordered that they both be reinstated. Fourth, defendants dispute the Gaspers' allegations that Oliver told William Gaspers that "if you continue to fight this and win, you know that your wife will be moved from that facility." They further claim that even if Oliver made this statement, he was expressing a legitimate concern about nepotism. Fifth, defendants claim that concerns Stickrath had about the Gaspers working together are not unconstitutional.

Turning to Aldine Gaspers, defendants argue that the evidence does not support her theory that transferring her was the next best thing to terminating William Gaspers. Defendants contend that the clear message in transferring Aldine Gaspers was that she had performed her job well, but not well enough, and the culture at ORVJCF needed to be changed. They argue that the delay in replacing her and the decision as to who her replacement should be are business decisions that are not subject to second-guessing by the trier-of-fact. Finally, defendants argue that the alleged temporal proximity is not evidence of a causal connection because the intervening mini-gym incident and Aldine Gaspers' response break the inference of any causal connection.

Defendants allege that Aldine Gaspers' free speech retaliation claim fails because most courts require that testimony provided in a judicial forum must address a matter of public concern in order to support a First Amendment retaliation claim, and her testimony regarding a

23

family camping trip and how laundry was handled following the trip, which bore on the issue of whether William Gaspers' possession of the pistol was inadvertent, does not bear on a matter of public concern. Moreover, defendants claim that although two circuits other than the Sixth Circuit have held that testimony before a judicial forum is automatically protected, neither circuit has extended this holding to testimony provided in a private arbitration proceeding.

In addition, defendants contend that the claim fails because plaintiffs have come forward with no evidence that either Stickrath or Morbitzer knew that Aldine Gaspers had testified at the arbitration or were aware of what she had said and, in fact, Morbitzer testified that she was unaware.

As for plaintiffs' claims against DYS and ORVJCF, defendants allege that plaintiffs cannot obtain relief of any kind against them because they are not persons under § 1983 and claims for prospective injunctive relief must be brought against individual public officials in their official capacities.

Defendants further deny that it is their burden to establish who was not involved in acts taken against plaintiffs but argue it is plaintiffs' burden to establish their individual involvement in order to avoid summary judgment on their claims against an individual defendant.

Finally, the individual defendants contend that they are entitled to qualified immunity because no Sixth Circuit case law supports the plaintiffs' position that retaliation for concerns about nepotism is actionable and there is no evidence to support the theory that defendants acted for any reason other than a constitutional motive.

## V.  Opinion

### A.  Qualified Immunity Standard

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." ***Harlow v. Fitzgerald***, 457 U.S. 800, 818 (1982). Qualified immunity involves a two-step inquiry: (1) "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the [official's] conduct violated a constitutional right?" and (2) Was the right was clearly established? ***See Saucier v. Katz***, 533 U.S. 194, 201 (2001). Courts may, in their sound discretion, decide which of the two prongs should be addressed first in light of the particular circumstances of the case in issue. ***Pearson v. Callahan***, __ U.S. __, 129 S.Ct. 808, 818 (2009).

**B. Title 42 U.S.C. § 1983**

Title 42 U.S.C. § 1983 creates a cause of action against any person who, acting under color of state law, abridges "rights, privileges, or immunities secured by the Constitution and laws . . ." A claim under §1983 has two requirements: (1) state action (2) that deprived an individual of federal statutory or constitutional rights. ***Bloch v. Ribar,*** 156 F.3d 673, 677 (6th Cir. 1998) (citing ***Parratt v. Taylor,*** 451 U.S. 527, 535 (1981)).

**C. Claims Against ODY/ORVJCF/The Individual Defendants in Their Official Capacity**

The Eleventh Amendment bars suit against a state and its agencies in federal court unless the state has expressly waived its sovereign immunity or has consented to be sued in federal court. ***Grinter v. Knight***, 532 F.3d 567, 572 (6th Cir. 2008) (citing ***Will v. Mich. Dep't of State Police***, 491 U.S. 58, 71 (1989)). This is true regardless of the relief sought. ***See Whittington v. Milby***, 928 F.2d 188, 193 (6th Cir.1991) (citing ***Alabama v. Pugh***, 438 U.S. 781, 782 (1978)). The Eleventh Amendment likewise bars suits for money damages against a state official in his or

her official capacity absent waiver or consent by the state since "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office." *Will*, 491 U.S. at 71. Congress did not abrogate the Eleventh Amendment when enacting § 1983. *Rodgers v. Mich. Dept. of Corrections*, 29 Fed.Appx. 259, 260 (6th Cir. 2002) (citing *Will*, 491 U.S. at 71); *see also Hamilton's Bogarts Inc. v. Mich*., 501 F.3d 644, 654 n.8 (6th Cir. 2007) (states are protected by the Eleventh Amendment from suits brought under § 1983 since the statute creates a cause of action only against a "person" who causes the deprivation of another's constitutional rights). Therefore, neither a state, a state agency, nor a state official sued in his official capacity for monetary damages is a "person" subject to suit under § 1983. *Rodgers*, 29 Fed.Appx. at 260 (citing *Will*, 491 U.S. at 71). A state official sued in his official capacity for prospective injunctive relief is, however, considered a person under § 1983. *Will*, 491 U.S. at 71 n.10; *Hamilton's Bogarts*, 501 F.3d at 654 n.8.

In accordance with the governing law, all of plaintiff's claims brought against DYS and ORVJCF, both state agencies, under § 1983 are barred by the Eleventh Amendment. Plaintiffs' claims against the individual defendants in their official capacity for money damages are similarly barred. However, to the extent plaintiffs seek only prospective injunctive relief against the individual defendants in their official capacity or monetary damages against the defendants in their individual capacity, the individual defendants are persons who may be sued under § 1983. Those claims are addressed below.

## D. Claims Against Defendants Heineman and Braverman

Plaintiffs may not proceed on their claims against defendants Heineman and Braverman because plaintiffs have failed to produce evidence to show that these individual defendants

engaged in any wrongdoing.  Defendants Heineman and Braverman are therefore entitled to summary judgment on the claims against them, and the Court will not discuss these defendants in connection with plaintiffs' specific claims.

## E.  First Amendment Claims

To establish a prima facie case of First Amendment retaliation under § 1983, the plaintiff must establish that:  (1) he or she was engaged in a constitutionally protected activity; (2) he or she was subjected to adverse action that would likely chill a person of ordinary firmness from continuing to engage in that activity; and (3) the protected activity was at least a motivating factor in the adverse action.  *Jenkins v. Rock Hill Local Sch. Dist.*, 513 F.3d 580, 585 (6th Cir. 2008) (citing *Bloch*, 156 F.3d at 678).

An inference that the plaintiff's protected activity was at least a motivating factor for the adverse decision may be supported by circumstantial evidence, such as the timing of events or the disparate treatment of individuals.  *See Arnett v. Myers,* 281 F.3d 552, 560-61 (6th Cir. 2002) (citing *Thaddeus-X v. Blatter*, 175 F.3d 378, 399 (6th Cir. 1999)).  "Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation."  *Mickey v. Zeidler Tool and Die Co*, 516 F.3d 516, 525 (6th Cir. 2008).  Where, however, "some time elapses between when the employer learns of protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality."  *Id*.  The Sixth Circuit explained the reason for this

distinction as follows:

> [I]f an employer immediately retaliates against an employee upon learning of his protected activity, the employee would be unable to couple temporal proximity with any such other evidence of retaliation because the two actions happened consecutively, and little other than the protected activity could motivate the retaliation. Thus, employers who retaliate swiftly and immediately upon learning of protected activity would ironically have a stronger defense than those who delay in taking adverse retaliatory action."

*Id*.

If the individual establishes a violation, the defendant can avoid liability "by showing that it would have taken the same action even in the absence of the protected conduct." ***Jackson v. Leighton,*** 168 F.3d 903, 909 (6th Cir. 1999).

There is a right to freedom of association in "intimate human relationships" that as early as 1984 the Supreme Court recognized is entitled to First Amendment protection. ***See Adkins,*** 982 F.2d at 956. In ***Adkins***, which did not involve an anti-nepotism policy, the Sixth Circuit found that the plaintiff had made out a prima facie case of a First Amendment violation based on her claim that the superintendent of a county school system had refused to recommend her for continued employment in the school system to punish her in part "for affiliation and association with her husband." The Court found that the evidence was sufficient to support a jury determination that the superintendent had refused to recommend the plaintiff because of her marriage to her husband. *Id*. at 955. The Court indicated that the defendant could escape liability by showing that the marriage was not a substantial or motivating factor in the decision or by showing that the plaintiff would not have been continued in her position even in the absence of the protected conduct. *Id*. at 957.

In a decision issued by the Sixth Circuit in a case involving an anti-nepotism policy, *Montgomery*, 101 F.3d at 1117, the Court addressed the appropriate level of scrutiny to be applied to an alleged First Amendment associational rights violation caused by a governmental anti-nepotism policy pursuant to which the plaintiff wife was required to transfer to another school in the same system following disclosure of her marriage to the plaintiff husband, who taught at the same campus. The Court determined that the appropriate level of scrutiny was rational basis.

In a subsequent Sixth Circuit case, the plaintiff claimed that she had been terminated from her position with the Sheriff's Department in retaliation for her husband running as a candidate for sheriff against the incumbent. *See Sowards,* 203 F.3d at 426. The Sixth Circuit applied the traditional burden-shifting analysis for a § 1983 First Amendment retaliation claim. The Court rejected the defendants' argument that a defendant's actions need only satisfy a rational basis test, explaining that it is not necessary to engage in such an analysis at the summary judgment stage if the plaintiff alleges they were terminated on the basis of a protected relationship. *Id* at 433. The Court indicated it was simply enough that the plaintiff there claimed that she was terminated because of her marriage, which the court stated "could constitute an undue interference in that relationship under *Adkins.*" The Court found that there was sufficient evidence to find that the defendant's decision to terminate the plaintiff's employment was substantially motivated by her First Amendment rights because defendant admitted he might have treated her case differently had plaintiff been one of his political supporters, and there is evidence that she was treated differently than other officers who had made similar mistakes. *Id*. at 434.

29

In *Vaughn v. Lawrenceburg Power System,* 269 F.3d 703, 712 (6th Cir. 2001), the Sixth Circuit drew a distinction between cases such as *Sowards*, which involved an act of purported retaliation that affected the right of marriage, and the case before the court, which involved a challenge to a rule or decision based on marriage per se. The Court noted that both *Montgomery* and *Sowards* had discussed *Adkins*, 982 F.2d at 956, and the court in both cases had noted that "the two types of cases are different, because the first type deals with an attempt to advance legitimate governmental interests, while the latter concerns an alleged intrusion onto a protected right without any policy justification." *Id*. at 712. The Court applied rational basis scrutiny to the anti-nepotism policy before it and found that in order to satisfy such scrutiny, "a rule interfering with the right of marital association under the First Amendment must advance a legitimate governmental interest and must not be an unreasonable means of advancing that legitimate governmental interest." *Id*. (citing *Montgomery*, 101 F.3d at 1130).

## 1. First Amendment Claim of William Gaspers

Plaintiffs claim that defendants took an adverse action when they terminated William Gaspers in retaliation for his marriage to Aldine Gaspers. Defendants argue that so long as they terminated William Gaspers because of the gun issue or because of concerns about nepotism, as opposed to based on an irrational desire to punish him for the conduct of his wife or the status of their relationship, their concerns necessarily satisfy the rational basis test so that their action passes constitutional muster.

It is undisputed that plaintiff William Gaspers was engaged in a constitutionally-protected form of association - his marriage to Aldine Gaspers - and he claims that he was terminated because of his protected relationship with his wife, which could constitute an undue

interference in that relationship under *Adkins*. Thus, William Gaspers has met his burden of establishing that he was engaged in the protected conduct of intimate association under the First Amendment.

William Gaspers has also met his burden of showing that he suffered an adverse action that would likely chill a person of ordinary firmness from continuing to engage in the constitutionally protected conduct. He was terminated from his employment (although he was subsequently reinstated by an arbitrator without backpay subject to certain conditions). The question is whether there is evidence of a causal connection between the exercise of his constitutional rights and the adverse action.

There is evidence that the decision regarding what discipline to mete out to William Gaspers was substantially motivated by his marriage to Aldine Gaspers. Following the pre-disciplinary hearing, Oliver asked William Gaspers if he would be interested in a transfer, stated that he would be fired if he did not accept the transfer, and told him that nepotism had been a problem at the facility since his wife had taken over and if it had been up to Oliver, he never would have allowed the Gaspers to work at the same facility. Oliver acknowledged at his deposition that the situation created by the Gaspers working together at ORVJCF was awkward and he was looking for a way to placate the union and salvage William Gaspers' job. He testified that he saw the transfer as a way to make his own job easier because it would fix the alleged perception of nepotism the union had raised. While plaintiff was returned to ORVJCF as part of the resolution of his grievance, there is evidence suggesting that defendants' unwillingness to return plaintiff to ORVJCF as part of a settlement of his grievance may have been motivated by a desire to separate him from his wife. Plaintiff notes that after he filed a

grievance, all proposed resolutions involved transfers to a different facility, and Oliver at one point advised William Gaspers that it he went to arbitration and won, his wife would be transferred. Aldine Gaspers testified at her deposition that at the arbitration, she overheard Krueger say, "If he thinks he's going back to ORVJCF, he's crazy; not while she's there," which Aldine Gaspers understood to be a reference to herself. This evidence, coupled with the other evidence of record, could be construed as supporting an inference that plaintiff was terminated because of his relationship with his wife.

Defendants attempt to justify the termination of William Gaspers by arguing that the OCSEA's concerns about nepotism satisfy the rational basis test. Pursuant to *Sowards*, however, the Court need not engage in a rational basis analysis at the summary judgment stage if the plaintiff alleges that he was terminated on the basis of a protected relationship, as William Gaspers has done here. In any event, defendants have not introduced any evidence to show that they had a policy against spouses working together, that the Gaspers' work arrangement violated an agency anti-nepotism policy in any respect, or that nepotism on the part of the Gaspers had suddenly become a legitimate cause for concern following several years of their working together in the same department, apparently without incident.

Turning to whether defendants have established that they would have taken the same action even in the absence of the protected conduct, there is no question that possession of the gun was sufficient to support William Gaspers' termination under the disciplinary grid and that two other employees had been terminated for similar offenses, although one of those employees was subsequently reinstated. While plaintiff alleges that one other employee could not challenge the action based on the union's failure to process the grievance in a timely manner,

32

this does not somehow demonstrate that this employee and plaintiff were treated dissimilarly. Plaintiff's attempt to distinguish his treatment from that of the second employee who was likewise terminated, Richard Litten, also falls short. Plaintiff claims that Litten was treated more favorably because he was reinstated with a suspension and given a two-year last chance agreement, which was subsequently reduced to 20 months, and Litten was not required to transfer to another facility as a condition of reinstatement. Plaintiff and Litten, however, were both terminated and were both subsequently reinstated with last chance agreements. The fact that Litten was reinstated as a result of the settlement of his grievance and that plaintiff was reinstated as the result of arbitration of his grievance does not demonstrate that Litten was disciplined less harshly for the same offense. To the contrary, defendants' like treatment of employees who had committed gun offenses supports a finding that the reason offered by defendants for William Gaspers' termination is valid. The court is not authorized to second-guess defendants' decision to impose the harshest punishment available under its disciplinary grid to employees committing such offenses.

Nonetheless, because there is evidence in this case suggesting that defendants may have bowed to the union's and the public's concerns about the Gaspers working together despite the apparent lack of any evidence that those concerns were legitimate, there is an issue of fact as to what the true motivation for William Gaspers' termination was and whether he was wrongfully terminated based solely on his relationship with his wife. Factual issues as to a party's motivation cannot be resolved on summary judgment but are the province of the jury to be determined at trial. Thus, with the exception of defendant Morbitzer, whom plaintiffs have not shown to have been involved in the disciplinary action taken against William Gaspers in any

respect, including the refusal to return him to ORVJCF, defendants are not entitled to either qualified immunity or to summary judgment on the First Amendment claim arising from William Gaspers' termination.

## 2. First Amendment Claims of Aldine Gaspers

Plaintiffs have established a prima facie case of First Amendment retaliation based on Aldine Gaspers' marriage to William Gaspers. It is undisputed that she was engaged in a constitutionally-protected form of association and she claims that she was transferred because of that protected relationship, which under the specific facts of this case could constitute an undue interference in the protected relationship under *Adkins*. Thus, Aldine Gaspers has met her burden of establishing that she was engaged in the protected conduct of intimate association under the First Amendment.

Aldine Gaspers has also met her burden for summary judgment purposes of showing that she suffered an adverse action that would likely chill a person of ordinary firmness from continuing to engaged in the constitutionally protected conduct. She was transferred to a different position in another locale, which the Gaspers allege created financial and other hardships for them. The question, then, is whether there is evidence of a causal connection between the exercise of her constitutional rights and the allegedly adverse action.

A reasonable fact-finder could determine from the evidence that Aldine Gaspers was transferred solely because of her relationship to William Gaspers. It was shortly after his reinstatement that she was informed she would be transferred. Although temporal proximity alone may not suffice under the facts of this case to establish a causal connection, particularly in

light of the intervening mini-gym incident, a reasonable fact-finder could question why an employer would relieve from her position an employee who was doing a "very good job" and who had attained good ratings and reviews in the past, particularly when the employer did not have a suitable replacement in mind. A reasonable juror could find Stickrath's vague and broad explanation that he wanted to "change the culture" at ORVJCF to be unconvincing in light of Aldine Gaspers' extensive work history and the fact that he had raised her rating to "on target." While defendants offer an explanation for the decision, it is the jury's province to make the necessary credibility assessments, weigh the evidence, and determine whether defendants' explanation is worthy of belief. The evidence of record, coupled with the temporal proximity to William Gaspers reinstatement, is sufficient in this case to create an issue of fact for the jury as to the real reason for Aldine Gaspers' transfer and to permit a jury to infer that defendants transferred her solely to punish her for her husband's reinstatement in violation of her First Amendment rights. Accordingly, defendants Stickrath and Morbitzer are not entitled to qualified immunity or to summary judgment on this claim. The remaining defendants are entitled to summary judgment on this claim, as well as the First Amendment claim alleging retaliation against Aldine Gaspers for testifying at her husband's arbitration hearing, because plaintiffs have not shown that they had any involvement in the decision to transfer Aldine Gaspers.

The Court finds that defendants Stickrath and Morbitzer are entitled to qualified immunity from suit on the First Amendment claim alleging retaliation against Aldine Gaspers for testifying at her husband's arbitration hearing because there was no clearly-established First Amendment right in this regard at the time of the events in issue. The Sixth Circuit had

recognized the filing of a lawsuit as protected conduct under the First Amendment right to "petition the Government for redress of grievances."  ***See Nicholson v. City of Westlake***,  76 Fed. Appx. 626, 628 (6th Cir. 2003).  However, neither the Sixth Circuit, the Supreme Court, nor the district court for the Southern District of Ohio had recognized the filing of a private arbitration or the provision of testimony in such a proceeding as protected conduct under the First Amendment.  Moreover, the cases from other circuits cited by plaintiffs for the proposition that the First Amendment protects a public employee from employer retaliation for participating in a legal proceeding are simply not applicable here as they involved a claim of retaliation for public criticism of the defendants and filing suit against them (***Sorrano's Gasco., Inc. v. Morgan***, 874 F.2d 1310 (9th Cir. 1989); police officer's statements to defense counsel and testimony on behalf of criminal defendant in federal prosecution regarding public official malfeasance in his public duties (***Melton v. City of Okla. City,*** 879 F.2d 706 (10th Cir. 1989); and extension of the right to petition the courts to state and federal agencies.  ***See Calif. Motor Transport v. Trucking Unltd.,*** 404 U.S. 508 (1972).  As this particular right alleged by Aldine Gaspers was not clearly established at the time of her transfer, defendants Stickrath and Morbitzer are entitled to qualified immunity on the claim brought against them in their individual capacity.  They are also entitled to summary judgment on the claim insofar as plaintiff seeks prospective injunctive relief because she has not come forward with sufficient evidence to show a causal connection between her testimony and her transfer.

## VII.  Conclusion

In accordance with the foregoing, defendants DYS and ORVJCF are entitled to Eleventh Amendment immunity, and the motion for summary judgment filed on behalf of these defendants is hereby **GRANTED.**  The motion for summary judgment filed on behalf of defendants Braverman and Heineman is **GRANTED**.  Defendants DYS, ORVJCF, Braverman and Heineman are hereby **DISMISSED** from the lawsuit.

The remaining defendants Oliver, Miller, Natalucci-Persichetti, Stickrath, Krueger and Morbitzer are entitled to summary judgment on the claims for damages brought against them in their official capacity, and the motion for summary judgment is **GRANTED** as to these claims and the claims are **DISMISSED.**

The First Amendment claim against defendants Oliver, Miller, Natalucci-Persichetti, Stickrath, Krueger and Morbitzer by Aldine Gaspers based on her testimony at the arbitration hearing is **DISMISSED**.  The motion for summary judgment is **GRANTED** as to the remaining First Amendment claim brought by Aldine Gaspers against defendants Oliver, Miller, Natalucci-Persichetti, and Krueger and is **DENIED** as to the claim brought against defendants Stickrath and Morbitzer insofar as plaintiff seeks money damages against them in their individual capacity and prospective injunctive relief against them in their official capacity.

The motion for summary judgment is **GRANTED** as to the First Amendment claim brought by William Gaspers against defendant Morbitzer and is **DENIED** on this claim against defendants Oliver, Miller, Natalucci-Persichetti, Krueger and Stickrath insofar as plaintiff seeks money damages against them in their individual capacity and against defendant Stickrath insofar as plaintiff seeks prospective injunctive relief against him in his official capacity.

The case will proceed to trial on the pending claims in accordance with the schedule established by the Court.

**IT IS SO ORDERED**.


                                        _____s/Herman J. Weber_____
                                        Herman J. Weber, Senior Judge
                                        United States District Court